**Meringolo & Associates, P.C.**
375 Greenwich Street
New York, New York 10013
(212) 941-2077 / (212) 202-4936 fax
www.meringololaw.com

June 10, 2021

<u>**VIA ECF**</u>
Honorable Ronnie Abrams
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

     **Re:**      *United States v. Joseph Meli,* **19 Cr. 480 (RA)**

Dear Judge Abrams:

     This letter is respectfully submitted to assist the Court in determining an appropriate sentence for Joseph Meli, who pled guilty on April 16, 2021 to conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. § 371. Pursuant to a plea agreement executed by the parties, it is respectfully submitted that Mr. Meli faces a Guidelines sentencing range of 37 to 46 months' imprisonment. However, in applying to Mr. Meli both the mandate in § 3553(a) that a sentence be sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2), and the sentencing factors set forth in § 3553(a)(1)-(7), the Court should impose a sentence of time-served, or, in the alternative, a term of imprisonment to run fully concurrent with Mr. Meli's other sentence that was previously imposed in this district (*United States v. Joseph Meli*, 17 Cr. 127 (KMW)) .

     While recognizing the seriousness of Mr. Meli's offense, the defense respectfully submits that a sentence of time-served (or, a term of imprisonment that runs fully concurrent with all other sentences) would be most proper considering all 3553(a) sentencing factors.  To date, Mr. Meli has already served a significant term of imprisonment related to his offense conduct and he is not scheduled to be released from prison until January 8, 2024. Due to the instant indictment, Mr. Meli has also served 22 months in extremely restrictive pretrial confinement at the Metropolitan Detention Center ("MDC") in Brooklyn, of which 14 months of imprisonment was spent there during the COVID-19 pandemic. Further exacerbating the harshness of his confinement, Mr. Meli was diagnosed with COVID 19 after being transferred to the MDC. While suffering from that serious illness, Mr. Meli was subjected to extended isolation and, most significantly, not able to communicate with his parents, wife and four children. This was particularly traumatizing for Mr. Meli and his family given that Mr. Meli is a cancer survivor and suffers a multitude of other medical ailments that placed him at a heightened risk for the worst effects of COVID-19.

     Notably, Mr. Meli continues to suffer from the effects of COVID 19 and a deterioration of his health generally. Being a cancer survivor with other continuing medical ailments, it remains

uncertain what long-term repercussions COVID-19 will have on Mr. Meli's health. A recent study by scientists at Texas Tech University states in relevant part:

> Changes in gene expression caused by the novel coronavirus may be behind long-term symptoms experienced by COVID-19 patients who have recovered….
>
> ***
>
> Even those patients who were not hospitalized with severe disease could have health implications months later…. Ailments could include respiratory conditions, diseases of the nervous system, mental-health diagnoses, metabolic disorders, cardiovascular and gastrointestinal conditions, and poor general well-being.[1]

Furthermore, Mr. Meli's current imprisonment has been uniquely onerous due to the Bureau of Prisons' ("BOP") recent retraction of its decision to provide Mr. Meli 33 months early release in connection with his prior sentence. Specifically, when Mr. Meli returned to Otisville in Orange County, New York earlier this year, the Warden of that facility had unilaterally ordered that under the CARES Act, and without any solicitation from the defense, Mr. Meli would finish his prior sentence on home confinement. Upon information and belief, this determination was based upon the BOP's holistic consideration of Mr. Meli's medical conditions, housing situation, and his exemplar conduct in prison, amongst other supporting factors justifying early release. While Mr. Meli and his family were officially notified that he would be returning home this past month, the BOP retracted its decision a few days before Mr. Meli's release (implying to Mr. Meli that such retraction was based on the pendency of this case). This last-minute change of plans was emotionally and psychologically devastating to not only Mr. Meli, but also his wife, four children and other family members who were anxiously awaiting his return home. Such an unfortunate circumstance is a particularly significant mitigating factor here, especially considering that the BOP has made an independent assessment that Mr. Meli is an appropriate candidate for early release and the 33-month loss from that early release technically serves as a punishment for this case.

Accordingly, considering both Mr. Meli's already definite term of imprisonment (*i.e.,* 78 months' imprisonment) and his current circumstances, the need for further imprisonment beyond January 8, 2024, is negligible, at best. Indeed, Mr. Meli has already taken tremendous strides towards rehabilitation, and he has a support system in place that will mandate his positive reentry into his community. Likewise, the record reflects that Mr. Meli has taken full responsibility for his offense conduct and he has demonstrated a great maturation while imprisoned. The aims of punishment have truly been satisfied by virtue of the unique circumstances presented here, and there exists good cause for the Court to sooner provide Mr. Meli a second chance by virtue of imposing the requested sentence, so that he can become a positive contributor to his family and community.

## I.   <u>Applicable Law</u>

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held the Sentencing Guidelines to be merely advisory. A sentencing court should consider the Guidelines along with all of the other sentencing factors set out in 18 U.S.C. § 3553(a). *United States v. Crosby*, 397 F.3d

---

[1] https://www.jpost.com/health-science/genetic-changes-could-be-behind-long-terms-covid-symptoms-666799

103, 111 (2d Cir. 2005).

In *Gall v. United States*, the Supreme Court set forth the procedure and order of consideration for district courts to follow at sentencing: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and benchmark." 128 S.Ct. 586, 596 (2007). Next, a sentencing court should "consider all of the Section 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, he may not presume that the Guidelines range is reasonable. He/She must make an individualized assessment based on the facts presented." *Id.* at 596-97.

Section 3553(a) requires consideration of still other factors in imposing a sentence "not greater than necessary," including: (1) the nature and circumstances of the offense and history and characteristics of the offender; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victims of the offense.

Finally, in deciding an appropriate sentence, "it is uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate…the crime and the punishment to ensue." *United States v. Koon*, 116 S.Ct. 2035 at 2053 (1996). Thus, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 2661.

## II.   The Advisory Guidelines Range

Pursuant to a plea agreement, Mr. Meli pled guilty to conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. § 371. As per that agreement, Mr. Meli's Guidelines range is 37 to 46 months' imprisonment, which is based on a Criminal History Category III and the following offense level calculation:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)): | 6 |
| Loss Calculation (U.S.S.G. §2B1.1(b)(1)(I): | 16 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)-(b)): | -3 |
| **Total Offense Level**: | **19** |

## III.   The § 3553(a) Sentencing Factors Strongly Militate in Favor of a Non-Guidelines Sentence

When considering all 3553(a) sentencing factors, it is respectfully submitted that a sentence of time-served (or, a fully concurrent sentence) would be most appropriate in this case. As explained briefly below, there are a multitude of factors favoring such result, including Mr. Meli's already long and harsh imprisonment and his definite sentence otherwise (*i.e.,* requiring his

imprisonment until January 8, 2024).

To be sure, Mr. Meli fully accepts responsibility for his actions, and he does not seek to minimize the severity and gravity of the offense conduct. Mr. Meli also fully understands his obligations to remedy these prior wrongs and the losses incurred by others because of his transgressions.  In this regard, providing Mr. Meli a sooner opportunity to rectify his wrongs, rather than prolonging an already substantial term of imprisonment, is most proper under the circumstances, especially considering Mr. Meli's significant strides toward rehabilitation.

**A. Mr. Meli's Already Long and Harsh Imprisonment**

Given the 22 months of harsh pretrial confinement that Mr. Meli has already suffered in connection with this case and his definite sentence otherwise (*i.e.,* requiring his imprisonment until 2024), there is little need to imprison Mr. Meli beyond 2024. Without minimizing the severity of Mr. Meli's offense, this prosecution has already drastically changed the trajectory of Mr. Meli's life, and his harsh and definite imprisonment otherwise has ensured specific and general deterrence.

By any stretch, the principles of punishment have and will be met by virtue of Mr. Meli's already definite sentence and his service of 22-months imprisonment in extremely harsh pretrial confinement during the COVID-19 pandemic. *Cf., United States v. Canizales*, 2013 U.S. Dist. LEXIS 175424, * 6 (E.D.N.Y. 2013) ("General deterrence is satisfied by the [year-and-one-day] sentence imposed; it sends a clear message that involvement in a drug conspiracy—no matter how minor—will result in the stain of a federal criminal conviction. Specific deterrence has been substantially achieved through the restrictions imposed by supervised release."); *United States v. Francis*, 2013 U.S. Dist. LEXIS 138603, * 6 (E.D.N.Y. 2013) ("General deterrence is satisfied by the felony conviction and its collateral consequences").

Indeed, there can be no dispute of the momentous deterrent effect of Mr. Meli's already definite imprisonment, further realized by the fact that Mr. Meli was imprisoned for 22 months in pretrial confinement at the MDC in Brooklyn during the COVID-19 pandemic. This was no trivial experience, especially since Mr. Meli suffers a multitude of medical issues that elevated his risk for the worst effects of COVID-19 and given that he contracted such virus while imprisoned. As the Court is aware, Mr. Meli is a cancer survivor and has a history of pulmonary disease.  In 2012, Mr. Meli was diagnosed with Papillary Thyroid Carcinoma (thyroid cancer), and he underwent surgery to remove his thyroid that same year.  While Mr. Meli is currently cancer free, he still suffers a weakened immune system and is susceptible to chronic respiratory and virus infections. All of which placed him at high risk for the worst effects of COVID-19 and continues to diminish his ability to deal with the lingering effects of that virus and other illnesses. As Mr. Meli's wife and sister best explain, Mr. Meli's harsh imprisonment at the MDC was traumatizing for both Mr. Meli and his entire family:

> Then he was sent to MDC and his world and ours turned upside-down. His impact as a man mitigated, his power to think beyond himself and stay present as possible for the boys, was made nearly impossible. Our visits stopped. It was hard to communicate. Joe, while still an encouraging voice, was locked in a cell 23 hours a day much of the nearly 2 years he was there. Our youngest son ▆▆ was 4 years old the last time he saw his father. He'll be 7 in June. Every wish ▆▆ has made over the years, whether on birthday candles or on fallen eyelashes, was a wish for his dad to be with him for his next birthday.

Exhibit 1, Letter of Jessica Meli.

For 22 months, I couldn't speak to my brother. For 22 months, I couldn't sleep without fearing if he was going to die at MDC. Die because of COVID and his pre-existing health conditions. Die because of dangerous gang members, drug dealers and violent murderous convicts existing in an environment ripe with hostility during the summer heat and a global pandemic lockdown. Witnessing my parents' distress, desperation and anxiety every day was horrific. Fearing they will die during his imprisonment at MDC because of COVID and being at the twilight of their life has been dreadful. Imagining what my nephews and my sister-in-law were going through was excruciating. Imagining what Joe may have experienced and endured if he was lucky enough to be alive after surviving at MDC was awful. To be clear, I have never gone more than 48 hours in my life without communicating with my brother other than this time period. I can honestly not imagine how my nephews have been traumatized, impacted or changed from not being able to communicate or see their dad.

Exhibit 2, Letter of Marissa J. Swann.

Mr. Meli's elderly mother and father were also greatly impacted by Mr. Meli's circumstances, worrying constantly about their son's wellbeing and the risks associated with his ailments, especially after being informed that he had contracted the COVID-19 virus:

[Joe] was kept in COVID lockdowns for most of that time-that he was confined to his cell for 23 or 24 hours per day for the overwhelming majority of his days at the MDC. Joe has definite comorbidities, including being a thyroid cancer survivor. Yet his formal appeal for a period of home confinement to protect him from the virus was denied. Despite being kept partially segregated in lockdown, Joe did contract the coronavirus while at the MDC. At that point, he was put in solitary confinement, to see whether or not he would recover. We could only hope and pray for the best. Fortunately, he has recovered. I later asked him whether he had received any therapeutic or medical attention while he was ill, to which he replied, "dad you're luck if you get hot water".

Exhibit 3, Letter of Anna & Richard Meli.

In short, during his 22-month stay at the MDC, Mr. Meli was subjected to horrible prison conditions, exacerbated by continuous lockdowns and a complete lack of social/family visiting. While prison is supposed to serve as a form of punishment, it is not supposed to be a mechanism of trauma to the degree that Mr. Meli and his family endured. There can be no dispute that the conditions at the MDC were far beyond any appropriate civilized punishment. For 14 months, Mr. Meli had no social visits with his wife and children, nor an in-person legal visit during the same timeframe.  At various times, Mr. Meli was locked inside his cell between 21-24 hours per day and was not even permitted to shower or contact his family for days/weeks on end.

By all accounts, Mr. Meli's harsh imprisonment during the COVID-19 pandemic was overwhelmingly severe and should be accounted for in connection with his sentence here. *See, e.g., United States v. Garcia*, 2020 WL 7212962, at *3 (S.D.N.Y. Dec. 8, 2020) (Prison sentences served during the pandemic, like here, "mak[e] the conditions of confinement harsher, both physically and psychologically, than they would normally be," given the constant lockdowns and other restrictions, and perhaps "enhance the deterrent effect of prison."); *United States v. Romero*, 2021 U.S. Dist. LEXIS 73877, at *8-9 (S.D.N.Y. Apr. 16, 2021) (finding that a "day spent in

prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing." Id. at *10. See also *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 U.S. Dist. LEXIS 181004, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal.").

The circumstances of Mr. Meli's case also best illustrates that no man is an island. Indeed, Mr. Meli had never been imprisoned before 2018 and such an experience has been a convincing one, as both he and his family have learned the devastating pains of imprisonment. *See United States v. Lenagh*, 2009 WL 296999, at *6, 2009 U.S. Dist. LEXIS 9226 (D. Neb. Feb. 6, 2009) ("A sentence of 24 months is a significant sentence, especially to an offender who has never been incarcerated at all."). While Mr. Meli has personally suffered for his mistakes by virtue of his harsh imprisonment, so too did his parents, siblings, wife, and children. They too have been emotionally, economically, and socially impacted as result of Mr. Meli's imprisonment, exacerbated by the restrictive barriers caused by the COVID-19 pandemic.

Thus, while it is acknowledged that all imprisonment has a collateral impact on offenders and their families, it cannot be said that such a reality is always evenhanded, especially for those imprisoned during the pandemic. Simply put, the collateral impact and hardships suffered by Mr. Meli and his family are unique enough to warrant consideration by the Court in the mitigation of his punishment. *Cf., United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (The Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom.") (*citing United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992). To be sure, in their letter to the Court, Mr. Meli's mother and father highlight some of the unique adverse consequences suffered by Mr. Meli, that include, not only a loss of freedom, but also the fact of his wife and four children "losing their home, their belongings, leaving their schools and friends, moving to the mid-west, and so on." Speaking to the suffering endured by the children because of Mr. Meli's long imprisonment, Mr. Meli's parents note that "the insecurity, stress, and distress levied on innocent children, who cannot adequately comprehend why their lives are being mangled at the core, is the most unfair and harsh consequence of all." Exhibit 3, Letter of Anna & Richard Meli.

As Mr. Meli's wife further explains, it has been no easy task handling the painful reality of her husband's long and harsh imprisonment, while also tending to their four children who are all coping with the loss of their father's guidance and presence during a pivotal time:

> Most days I am strong and brave because I do feel that way, but my children also need me to be. We have made our way through this surreal and scary time. Joe helped this happen. From the depths of hell in MDC, still his light shone through in the rare and too brief phone calls. He stood through every blow, each set back, lived in anxiety and fear of Covid, and then covid itself. He suffered in 24-hour lockdowns, and an almost absolute separation from us for well over a year.

Exhibit 1, Letter of Jessica Meli.

Ultimately, the Court's imposition of a sentence of time served would be most appropriate here, serving as a sufficient punishment given the harshness and length of confinement that Mr. Meli has endured and will continue to serve otherwise until 2024. *See, e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States v. Behr*, 2006 WL 1586563, at *5 (S.D.N.Y. 2006); *see also United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account . . ."); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis*, 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), citing *United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

Notably, as it also relates to general deterrence, there can also be no legitimate doubt that a reasonable person would not already be deterred from committing the same offense conduct at issue here. Simply put, given the harsh and already long imprisonment that Mr. Meli has endured, no reasonable person would view Mr. Meli's circumstances and not be deterred from repeating the same. Mr. Meli has not only lost his freedom and possessions, but also, he has suffered the pains of extremely harsh conditions of confinement. Mr. Meli also had to live with the fact that he could not be present for his parents, wife, and children during the raging COVID-19 pandemic and at other important stages of their lives. Since "general deterrence depends on potential offenders' rational assessment of the likely costs and benefits of crime", there is little doubt that general deterrence is not already achieved here. *United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011); *United States v. De Jesus*, 20-cr-19 (PAE) (S.D.N.Y., July 1, 2020) (considering at sentencing the harsh prison conditions suffered by the defendant because of the COVID-19 pandemic, explaining that "[a]ny mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that [the defendant] experienced.").

**B. Mr. Meli's Loss of 33-Months Early Release**

A sentence of time-served (or, a fully concurrent sentence) is also supported by Mr. Meli's 33 month loss from early release in connection with his prior sentence. Although, the Bureau of Prisons determined on April 27, 2021, that Mr. Meli was eligible for early release in connection with his prior sentence, he will remain imprisoned until 2024 because of this case. In this regard, the Bureau of Prisons had recently concluded, *unsolicited by any request from the defense or Mr. Meli himself*, that Mr. Meli presented no risk to his community and that he would serve the remainder of his prior sentence on home confinement to begin on May 18, 2021:

> This notice is to inform you that JOSEPH MELI has been approved for a furlough. During a furlough, an inmate is authorized to be absent from the institution in order to participate in specified programs or activities. Inmates who participate in furloughs must meet strict eligibility requirements. Inmate MELI has met the eligibility criteria and will be on furlough from this facility from May 18, 2021, to November 14, 2021. While on furlough, the inmate will be in Port Chester, New York.

7

In addition to the information provided regarding this offender's furlough, the following information is relevant to the inmate's eventual release. The inmate is scheduled to release on January 8, 2024. The inmate is not eligible for parole. Upon release, the inmate will reside in Port Chester, New York, and will be supervised by the United States Probation Office at USPO - Southern District of New York - New York, The Woolworth Bldg, 14th Floor, 233 Broadway, New York, New York 10279-1312. Additionally, as a result of the COVID-19 pandemic, the Attorney General directed the BOP to place inmates who are at a minimal risk of recidivating in home confinement. Accordingly, inmate Meli has been reviewed and determined eligible for placement in Home Confinement to serve the remainder of his sentence.

However, after Mr. Meli was already waiting almost two weeks in quarantine as part of BOP protocol to allow for his release, the BOP then informed him that it was retracting its decision (implying because of the pendency of this case) and that he would have to serve the remainder of his prior sentence in a custodial setting. This news emotionally and psychologically crushed Mr. Meli and his family, and the sequence of the BOP's unsolicited decision making caused unwarranted pain on Mr. Meli's children:

Last month, Joe called me to tell me he was being release on furlough, that he didn't understand the parameters yet but that our family could be reunited. We decided for the well being of the kids that we would keep the news quiet and tell them just days before our trip to NY.  (Due to the circumstances of our lives, I had to move our family to Mpls to be near the care of my parents). Then just 2 days after Joe's news, a letter went out from the DOJ to everyone involved in the case and soon everyone knew Joe would be released on furlough and home confinement. With what now seemed official certainty, I had the beautiful long awaited experience of telling my 4 sons that after these 3 unimaginable years, that they'd soon be with their dad again. That ████would celebrate his 7th birthday with Joe, that ███ would have both of his parents by his side as he becomes a bar mitzvah, that ████ would have a 4 day delay in the best 17th birthday present and that ████ would be greeted home from his first year of college by his dad. As the mother and the only parent to hold the hand of the little boys who have learned to be brave, who have built up immunity to suffering and loneliness and fear, I had to work on my feelings, my shift in mindset, with the anticipated arrival of Joe back in our physical lives. I, then again had to put aside and make room in my broken heart and baffled mind to support my young sons with their disappointment that their dad's release would not be. This broke them down. With everything they have endured with heads up and inspiring strength, this event had impact. I don't need to explain the gut wrenching experience it was telling ███ and ███, ██████ and ███, that Joe would not be getting out as they had been told. The grit and resilience wore off momentarily but we've all learned not to be bowled over by things we have no control of. Joe has modeled that for us. He again was a positive force for us.

Exhibit 1, Letter of Jessica Meli.

Putting aside the significant anguish experienced by Mr. Meli and his family because of this occurrence, it is evident that Mr. Meli is prepared to renter his community now and there can be no legitimate concern that his reentry into the community in 2024 would pose a great risk to warrant his further imprisonment. It also cannot be said that Mr. Meli's current imprisonment, beginning on May 18, 2021 (*i.e.,* the date on which the BOP was set to provide Mr. Meli early release) until January 8, 2024 (*i.e.,* the date on which Mr. Meli is currently scheduled to be released from prison), is not already a punishment rendered as a result of this very proceeding, since Mr. Meli would have been released 33 months earlier on his prior sentence but for this case. In short, Mr. Meli's loss of early release and the findings of BOP officials that Mr. Meli was ready to reenter his community now strongly militates in favor of a sentence of time-served (or, a fully concurrent sentence).

## C.   Mr. Meli's Voluntary Cessation of Criminal Activity

A sentence of time-served (or, a fully concurrent sentence) is further supported by the fact that Mr. Meli voluntarily ceased his illicit activity more than three years ago and that the activity alleged in the instant matter was not committed post release from the prior sentence cited above.

Indeed, while Mr. Meli's Criminal History is acknowledged to be category III as a matter of the law, it cannot be overlooked that Mr. Meli is not factually a true repeat offender to warrant a double/aggravated punishment here. To be sure, the offense conduct at issue is not wholly unrelated to the prior case nor did it occur after Mr. Meli had already served his prior sentence. Indeed, his offense conduct did not continue after he began service of the sentence that was imposed in his prior prosecution. On the contrary, Mr. Meli voluntarily ceased his offense conduct upon serving his prior sentence and he has since utilized his time imprisoned to rehabilitate himself.

As reflected by both the charging instrument and the plea agreement, the instant conduct occurred during a short period of time (March 2017 and June 2018). Mr. Meli voluntarily abandoned such activity before serving the sentence imposed in *United States v. Joseph Meli*, 17 Cr. 127 (KMW). In connection with that case, Mr. Meli surrendered to the Bureau of Prisons on June 26, 2018, which coincides with the end of the offense conduct alleged here (i.e., June 2018). Indeed, it was not until April 24, 2019 that Mr. Meli was charged in the instant case—almost a year after Mr. Meli's offense conduct had voluntarily ceased.

In this regard, it is evident that a Criminal History Category III (while technically applicable here and agreed upon by the parties that it should be applied as a matter of law) overstates Mr. Meli's criminal history and does not truly reflect the circumstances presented here. For example, Mr. Meli's Criminal History Category is enhanced by five points pursuant to U.S.S.G. §4A1.1(a) & (b) since he was convicted in the prior case and he had technically committed the instant offense while under a criminal justice sentence. While such significant enhancements generally capture offenders that continue to engage in illicit activity while serving another sentence or thereafter, it cannot be said that such is truly the case here. Indeed, but for a technical application of the criminal history points mentioned above, Mr. Meli would have been in a Criminal History Category I and his advisory Guidelines range would be reduced to 30-37 months.

Under such circumstances, a Criminal History Category of III overstates the seriousness of Mr. Meli's criminal history, which independently militates in favor of a non-Guidelines sentence. *Cf. United States v. Rivers*, 50 F.3d 1126, 1130 (2d Cir. 1995) ("We agree with the other circuits

that section 4A1.3 manifests the [Sentencing] Commission's view that a sentencing judge should exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation . . . either underrepresent or overrepresent the seriousness of a defendant's prior record."). Considering such a mitigating factor alone, there is very compelling cause for the Court to impose a sentence of time-served (or, in the alternative, a term of imprisonment to run fully concurrent with Mr. Meli's prior sentence).

### D. Mr. Meli's Strides Towards Rehabilitation

A sentence of time-served (or, a fully concurrent sentence) is also supported by Mr. Meli's rehabilitation and his low risk of recidivism. Indeed, the need for further punishment to avoid potential recidivism in Mr. Meli's case is virtually nonexistent. Not only is Mr. Meli set to remain imprisoned until 2024, but he has also already demonstrated a commitment to never repeat this process again. In this regard, Mr. Meli's prison record is exemplary, and he has a support system in place that will mandate his positive reentry into his community once he is released. The record also reflects that Mr. Meli has demonstrated a great maturation and a desire to lead a law-abiding life. Notwithstanding the harshness of his confinement and other setbacks, Mr. Meli has remained positive and motivated to return to his community and family as a positive and law-abiding contributor:

> What I saw and continue to see is patience, fortitude, emotional reflection, remorse for his initial crimes/decisions to break the law and love. There is no defensiveness, no excuses, no self-pity. He is at peace and reconciled. He is focused on trying to impart his genuine remorse and hope for compassionate release so he can re-start his life emotionally supporting his four boys, his wife, my parents and myself. My brother Joe will always be an empathetic, gentle, productive and positive member of society. He recognizes and has taken ownership for his fraud in his professional life. He has honored his imprisonment with model behavior and will never again break the law when released. I do believe his substance abuse played a part in some of his initial decisions. However, he owns every part of his actions and I believe he is a changed person from this experience. He is restored.

Exhibit 2, Letter of Marissa J. Swann.

> Joe is a bright, talented individual, with a strong work ethic. He has the skill set and the capabilities to rebuild a good life and make a significant positive contribution to society. He has intense motivation, stemming from how much he loves his family, which will drive him to be productive, never again violate the law, and continue to raise his sons to be good men. He has confided in us that being in prison has given him a great deal of time to meditate and reflect. We recognize the different stages he's gone through, and can see that he has come to clear realizations about what he did wrong and how he need to change his behavior going forward.

Exhibit 3, Letter of Anna & Richard Meli.

Given Mr. Meli's exceptional conduct while imprisoned, accounting for a perfect disciplinary record and stellar work performance (even during the most strenuous of times), there exists no benefit in requiring Mr. Meli to serve an additional term of imprisonment after an already exceptionally long term of imprisonment that will not expire until 2024. To the contrary, an additional term of imprisonment would only work to destroy Mr. Meli and his family. *See United*

*States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) ("Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when, as here, the stakes are at their highest.").

It is also important to note that Mr. Meli has taken strides to address his prior substance abuse issue and intends to enter the RDAP Program once this case is resolved. There, Mr. Meli will be able to better address the remaining factors that contributed to his past transgressions, and he will become even more prepared to reenter his community as a positive contributor. Notably, many courts have considered as a mitigating factor the effects that addiction had on defendants like Mr. Meli and a defendant's commitment to rehabilitate himself prior to release.

For example, in *United States v. Ilayayev*, the Court sentenced the defendant, who suffered an oxycodone addiction and was facing a Guidelines range term of imprisonment of 57 to 71 months', to five-years' probation. The Court explained:

> General deterrence is accomplished. The sentence will send a clear message that any involvement in the distribution of prescription drugs such as oxycodone will result, at the very least, in a substantial restriction of freedom. Specific deterrence will be achieved through an extended period of monitoring by probation and a curfew that imposes significant limitations on the defendant's activities unrelated directly to work or rehabilitation. It is unlikely that he will engage in further criminal activity because of his demonstrated commitment to rehabilitation.

800 F. Supp. 2d 417, 451 (E.D.N.Y. 2011).

Considering all factors, it also cannot be overstated that Mr. Meli's case presents as an extremely low risk for recidivism. Specifically, given Mr. Meli's non-violent offense conduct, his already definite long term of imprisonment, and his age upon his release (50), there is a great unlikelihood that Mr. Meli will ever reoffend. *See, e.g.,* Kim Steven Hunt and Billy Easley, II, *The Effects of Aging on Recidivism Among Federal Offenders*,[2] at 3 (December 2017) (finding lower rates of recidivism based on, among other things, an offender's age and non-violent offense conduct). Indeed, according to relevant statistics, there is an inverse correlation between Mr. Meli's age group and recidivism. Specifically, it is evident that men are far less likely to be involved in criminal conduct after the age of 30. *Id.* at 22 (December 2017) ("the Commission's research shows that the younger than 30 age group had the highest rearrest rate (64.8%) and the rate declined with each age group that follows to a low of 16.4 percent."); *id.* at 26 ("Rearrest rates declined with the age at release across all sentence lengths.").

Notably, research has also *not* demonstrated that a lengthier sentence will necessarily reduce recidivism. "Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed….[A]mong all offenders sentenced to one year or more of imprisonment, *there was no clear association between the length of sentence and the rearrest rate*," *Id.*, at 3 (emphasis added);

---

[2]    Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

*see also* Hopwood, Shon R., *Improving Federal Sentencing* (March 15, 2018),[3] University of Missouri-Kansas City Law Review, Vol. 87, No. 79, at 90-91, 2018 ("There is also reason to believe that long prison sentences cannot be justified on the basis of specific deterrence. [T]he U.S. Sentencing Commission released a study explaining that those released early under the Fair Sentencing Act had the same recidivism rate as those who did not receive a reduction, meaning longer sentences did not necessary provide specific deterrence.").

Accordingly, the relevant factors concerning Mr. Meli's rehabilitation and low risk of potential recidivism, including his age, health, rehabilitation, and familial circumstances, strongly militate in favor of the requested sentence.

## **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that after the Court's consideration of all 3553(a) sentencing factors (to include both Mr. Meli's already harsh and definite sentence and his loss of 33-months early release), a sentence of time-served would be most proper under the circumstances, especially since Mr. Meli will not be released from prison until 2024 even with the Court's imposition of such sentence.

The Court's consideration of this submission is greatly appreciated.

Respectfully submitted,

*/s/ John Meringolo*
John Meringolo, Esq.

*/s/ Anthony DiPietro*
Anthony DiPietro, Esq.
Law Offices of Anthony DiPietro, P.C.
15 Chester Avenue
White Plains, NY 10601
(914) 948-3242

---

[3] Available at SSRN: https://ssrn.com/abstract=3353521