

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 16, 2021

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: *United States* v. *Joseph Meli*, 19 Cr. 480 (RA)

Dear Judge Abrams:

  The defendant in this case, Joseph Meli ("Meli" or the "defendant"), is scheduled to be sentenced on Friday, June 25, 2021 at 9:00 am, having pleaded guilty pursuant to a plea agreement to one count of conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. § 371. The Government respectfully submits this letter in advance of the sentencing. Pursuant to a plea agreement between the parties, the defendant's stipulated Guidelines range is 37 to 46 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government submits that a sentence within the Stipulated Guidelines Range is warranted in this case.

  **A. Background**

  On January 26, 2017, in connection with a separate investigation in this District, Meli was charged by Complaint in the U.S. District Court for the Southern District of New York for his involvement in an extensive investment scheme in which he defrauded over 100 investors who invested a total of approximately $100 million in reliance upon Meli's false representations that the investor funds would be used to purchase tickets to various live events for resale at a profit on the secondary market. *See United States v. Meli*, 17 Cr. 127 (KMW). In fact, Meli spent much of the investor funds on himself, purchasing a multi-million dollar home, watches, jewelry, and a Porsche, and using new investor funds to pay back old investors in a Ponzi-like manner. Meli ultimately pleaded guilty to committing this extensive fraud on or about October 31, 2017, and was later sentenced by the Honorable Kimba M. Wood to 78 months' imprisonment on or about April 3, 2018. Long before Meli's change of plea, soon after Meli's arrest in January 2017, and while on pretrial release, Meli refashioned his fraud scheme to concoct a new stream of illicit income that could be concealed from the Court and the Government during the pendency of Meli's case, while there was heightened scrutiny and supervision on his activities.

Hon. Ronnie Abrams                                                                                                Page 2
June 16, 2021

     Mere months after his arrest in connection with his first fraud case, Meli, along with several others, formed a new company, Indio Entertainment, LLC ("Indio"), in which Meli would be a silent partner. Although Meli had no formal title in the company, his involvement was extensive. Meli provided the CEO of Indio with the same contracts, templates, and other documents he had used in connection with his first fraud scheme, to be repurposed and used under the guise of this new company. Meli purported to have connections in the entertainment industry that would provide him access to bulk tickets at a discounted rate, and an existing inventory of such discounted tickets that could immediately be purchased by Indio from Meli and sold. Meli in fact recruited his cousin, Jamies Siniscalchi, to serve as the Chief Compliance Officer of Indio, and to incorporate companies that Meli would later use as front corporations to accept investor funds funneled through Indio, under the pretense that these companies would supply Indio with blocks of tickets to Broadway shows. As with the initial fraud scheme, Siniscalchi (signing on behalf of these corporations) executed false contracts with Indio pledging to provide certain bulk tickets for a certain price. Indio, in turn, executed contracts with investors, pledging to provide them with tickets in exchange for their investment. In this manner, Indio received investor funds, then transferred those same funds to bank accounts controlled by Siniscalchi. As with Meli's initial fraud scheme, there were in fact no tickets.

     Siniscalchi used these investor funds to pay Meli's personal expenses, often after cycling these funds through various other corporate accounts also controlled by Siniscalchi. By way of example, $500,000 was transferred to an individual completely unrelated to the ticket industry, who claimed that the funds were an investment in a marijuana grow farm. $18,000 was paid to Meli's wife. $45,000 and $449,000, respectively, were paid to entities in which the defendant's father was a principal, at least in part to repay credit card payments that Meli was charging on his father's credit cards. $500,000 was withdrawn in cash or cashier's checks. $150,000 was paid to a law firm that represented Meli in connection with Meli's initial criminal case in *United States v. Meli*, 17 Cr. 127 (KMW). Over $220,000 was issued to a residential management company that managed an apartment Meli was leasing at the time.

     In short, Meli repurposed his original fraud scheme; in light of his arrest, and because Meli could no longer solicit investors funds or transact in large dollar amounts in his own name without detection, Meli instead used the façade of a new company, and others who served as Indio's principalsto continue defrauding investors and pocketing their funds.

     Meli's engagement in the instant offense continued well after his arrest in connection with his first fraud case. With respect to Indio, Meli continued the charade that he had purchased tickets, and would provide investor returns by an ever-evolving deadline, even after he was sentenced by Judge Wood for his initial fraud scheme. Meli coached his associates to placate investors throughout, all for the purpose of delaying discovery of his fraud. To that end, Meli would be blind carbon-copied on emails, and joined conference calls as a silent participant, railing in private against investors whom he deemed too demanding. His engagement in the instant conspiracy only ceased when Meli surrendered to serve his term of imprisonment in connection with the initial fraud case.

Hon. Ronnie Abrams                                                                                                    Page 3
June 16, 2021

### B. Discussion

#### 1. Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### 2. A Sentence Within the Guidelines Range Is Appropriate In This Case

A Guidelines sentence is necessary here to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to this defendant and other similarly situated individuals, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). All of these considerations weigh heavily in favor of a sentence within the Guidelines Range, notwithstanding the 78-months sentence that Meli previously received.

*First*, a sentence within the Guidelines Range is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The offense conduct here was particularly egregious. The defendant deliberately constructed this fraud scheme to circumvent the oversight of the Court, his pretrial services officer,

and the Government, using a new company and new individuals as a buffer between himself and investors. Meli did this not merely to hide from the Court, but to ensure that he did not scare away investors, and could continue to receive investor funds. At least one investor, despite not knowing Meli's involvement, declined to invest in Indio because it too closely resembled Meli's initial fraud scheme. Meli—knowing full well the criminality of his actions due to his recent arrest—nonetheless reinvented his initial fraud and continued to victimize others to sustain his lifestyle. The defendant's conduct is particularly troubling given that there was little interruption between the first fraud scheme and this charged offense, and the parallels between each of these schemes.

*Second*, a substantial sentence is necessary to afford adequate deterrence to the defendant and to others similarly situated, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(B). For all the reasons enumerated above, there is an acute need for specific deterrence in this case. Meli seamlessly transitioned from his first fraud to the instant offense, with little interruption between the two schemes. In arguing for a time-served sentence, much of Meli's sentencing submission is focused on the effect of his incarceration as a result of serving his sentence for his first fraud scheme. *See* Def. Subm. (ECF No. 62). Meli's initial sentence, however, was ordered without any knowledge that the defendant was already knee-deep in a second fraud scheme, which he had initiated as a direct result of his arrest. In other words, the defendant's initial prison sentence is insufficient deterrence for the defendant, given that the sentence was imposed for a completely separate crime. Meli's argument that he voluntarily ceased the charged conspiracy at the time of his surrender in the summer of 2018 holds no weight whatsoever. *See id.* at 9. Meli deserves no credit for ceasing his crime, particularly as he did not at any point seek to return investor funds. He had no intention of making investors whole. Nor did Meli cease his criminal activity voluntarily. To that point, Meli had been orchestrating his second fraud, and lulling investors through Indio principals, using the encrypted communications app WhatsApp, and phone calls. Meli knew, upon surrendering, that his communications would be monitored and he would no longer be able to direct the conspiracy without being caught. The notion that Meli *chose* to end his criminal offense, and that this warrants leniency, is factually and legally wrong.

Significantly, Meli's sentencing submission is almost wholly devoted to his personal experiences while incarcerated, showing little remorse for his crimes, the victims of those crimes, or the Court. Meli's attitude exemplifies how little consideration he has for his victims, or the consequences of his crimes.

Further, there is a need for general deterrence. If Meli were to receive only a minimal sentence, the Court's sentence will send the message to the public that the charged offense – during the course of which Meli misled not only the victim-investors but also the Court, by way of Pretrial Services – does not rise to the level of seriousness as Meli's initial fraud scheme. A lenient sentence would hardly deter those considering engaging in a similar fraud, or in doing so while on pretrial supervision. A minimal sentence would send the signal to criminals that no serious consequences will follow for any crimes committed following arrest, and before surrender, even if such crimes were deliberately designed to circumvent oversight of the Court and law enforcement, for the purpose of continuing the same type of criminal activity. The Court should send a message here that such behavior is taken seriously.

Hon. Ronnie Abrams                                                                                    Page 5
June 16, 2021

### C. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines Range of 37 to 46 months' imprisonment would be fair and appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By: ___/s/_____
Sarah Mortazavi / Micah Fergenson
Assistant United States Attorneys
(212) 637-2520 / 2190

cc: Defense counsel (via ECF)